Council, are you ready to proceed? I am, your honor. May it please the court? I understand, before we start, that attorneys Laird and Abel are going to give you a fair warning. It will be up to you to keep track of your time. I won't be doing that for you, just to give you a fair warning up front. So, with that in mind, you may proceed. Please state your name for the record. Thank you, your honor. May it please the court? My name is Michael Laird. I am here on behalf of the appellant, Rebecca Petta. She is appealing the circuit court's order dismissing her negligence claim and consumer fraud act claim, which she brought for injuries that she suffered due to a debt breach that defendant experienced. Mr. Abel will be arguing on behalf of the DOE plaintiff. She appealed the same circuit court order, but for a different reason. She is appealing the dismissal of her complaint for lack of standing. Ms. Petta's appeal raises three primary issues. The first is one of duty. Whether or not there is a common law duty and statutory duty under Illinois law for defendant to take reasonable measures to protect the highly sensitive patient information that it collects and stores, especially in the face of the very foreseeable threat of a data breach. The second issue is the economic loss doctrine and whether that doctrine applies in a case like this, where there's no contractual duties at issue and the duties rise exclusively under statute and tort law. And the third issue is whether or not plaintiff's damages can be remedied through the Illinois Consumer Fraud Act. Starting with the first issue, there's really only one case on the issue of duty in the context of a data breach in Illinois. It's a 2010 case out of the Illinois Court of Appeals, the first district. Let me stop you for one second because this bothered me reading the briefs. In Illinois, unless you're in the federal court system, you weren't in the district court, you were in the circuit court. And throughout your brief, you labeled it as district court. Just for future reference, I know you guys are out of state, but that's fairly basic to know which court we're in. And I apologize for that, your honor. I caught that obviously too late, but during argument, and I've tried to refer to it as the circuit court here, but obviously we'll correct that in the future and apologize. So the only case on the issue of duty in Illinois court out of the Illinois Court of Appeals is the 2010 case, CUNY versus Chicago Public Schools. Now that case found no duty, but a lot has happened since 2010 when that case was decided, especially regarding the nature of data breaches, the foreseeability of these breaches, and the harm that it causes the data breach victims. In addition to that, the law has changed. During that time, there was no obligation on the entities like the defendant to reasonably secure data, and now there is. And if you look at these two data breaches, the facts of these breach, the CUNY case in this case, if you look at those two cases, the facts of the data breach are drastically different. And that's important here because the duty that Plaintiff Petta alleges applies here is a duty that depends on the specific fact and circumstances of the case before the court. So in some cases you may find a duty, but in other cases, the facts and circumstances may not warrant a duty. And specifically, that's the duty not to take acts or make omissions that create a foreseeable risk of harm on another. And if you do create that foreseeable risk of harm, you have a duty to mitigate that risk. This is a well-established duty in Illinois law that the Illinois Supreme Court has upheld. And when evaluating this duty, courts have looked primarily towards four factors. The first is the foreseeability of the harm. The second is the likelihood of the injury. The third is the burden of guarding against that consequence of putting that burden on the defendant. And if you compare this case to CUNY, you can see why the CUNY court, as we admit, likely came to the right conclusion, but that doesn't foreclose finding a duty in this case. The CUNY case isn't actually a data breach case. It's an accidental disclosure of data. The defendant in that case had accidentally mailed out benefits information that included sensitive information about former employees. It wasn't a deliberate targeting of the defendant as occurred in this case. It was an accident, which is not a highly foreseeable event. The likelihood of harm there to the data breach victims was also very low. And the reason for that is the data didn't go to criminals. It went to former public school employees, and there was no evidence that any of that data was ever misused and no evidence or allegation that the public school employees had any ability or intent to misuse that data. That's far different than a data breach case like this one. This is a deliberate and purposeful targeting of the defendant because the defendant has a host of highly sensitive patient information, including things like social security numbers and medical records, which not only can be used in fraud, they can also be sold on the dark web to fraudsters. So here, not only is this type of data breach foreseeable because it's happening across the notice that these types of breaches are occurring and they have to guard against them, the likelihood of injury is substantial here, as many courts have found. Let me stop you again. Where is there a right to recover or a right to sue on an individual basis for any of these offenses? I mean, the Apollo points that out in their brief that even though law has changed, it didn't change to give a duty and negligence on some of these and a right to sue on an individual basis. Where is that currently at in your estimation? Well, there's two points I would make in response. One is, if there is a duty under the common law, then there is still an obligation, there's still a right to bring that negligence claim for a statutory right of action that plaintiff has against the defendant, and that is through the Personal Information Protection Act. That act allows the plaintiff to bring a claim for breach of PIPA through the Illinois Consumer Fraud Act. So there is a private right of action. And with respect to the negligence claim, our view is that the ability to bring that claim to the Consumer Fraud Act shows the legislature's intent that defendants should be held liable to the plaintiffs for the injuries that they experience in a data breach. Can you quote anywhere in the Personal Information Protection Act that gives that right? I believe it's section 530-20. It says that a breach of PIPA is treated as an unfair and deceptive practice under the Illinois Consumer Fraud Act, which means that you can bring an Illinois Consumer Fraud Act claim should the defendant breach the statutory obligations in that case. And that is part of our claim. We do bring an Illinois Consumer Fraud Act claim alleging that the defendant breached its obligations under PIPA, but we also argue that because the defendant had a duty, not only under the common law, but through statute, and breached that duty, we can bring this. So let me ask you about damages. What specific damages do you claim? There's two primary damages. The first is the time and expense that the plaintiff here had to spend dealing with the data breach. Her information was actually misused after the breach occurred for several fraudulent loan attempts. Someone is trying to take out loans in her name using the information, or at least we allege, using the information. Did she know that was related to the data breach? In these cases, these data breach cases, there's never 100% certainty, and I'll admit to that. But what we generally look at is the timing of the data breach, and the timing of the fraud, and also the information used in the data, or taken in the data breach, and used in the fraud. And what we allege here is given the proximity between the data breach, you have the data breach, this information is taken, and shortly after you have this fraud, there's a high likelihood that the fraudulent attempts relate to the data breach itself, especially when some of the information taken in the breach is actually being used on these fraudulent loan attempts. So even though there's not 100% certainty, and that's not what is required under the law, it has to be more likely than not, even though there's not 100% She's claiming a loss of confidentiality and integrity of her personal information, is that right? That is the second primary injury that we allege, that the value of her personal information is decreased when it falls in the hands of cyber criminals. And this is a well-established loss that many courts have recognized, and have indicated that the trend is to find this as viable damages theory. Any Illinois courts that have found that? It hasn't been considered under Illinois law yet, but our argument is that when the sensitive data falls in the hands of cyber criminals, its value is lessened. And the reason is that this data is used to confirm the plaintiff's identity. She puts it on her loan applications, she puts it on her credit card applications, she provides it to the IRS, and everyone can trust when they get that data that this is Rebecca Petta making the application. When this data falls in the hands of cyber criminals who are actively misusing it, nobody can trust that that name, Rebecca Petta, and that information actually reflects her making the loan, applying for the credit card, or whatever it is. And that reduces the value of this data in the common marketplace of goods. Let me ask you one other question, going back to Justice Moore's question. With regard to her damages, her alleged damages, the first set of damages, her time and expense in protecting and correcting and so forth and so on, did she lay that out? Did she give specifics on what those damages were? The complaint is not very clear on that. It's mostly the time and effort that she had to deal with these fraudulent loans and working with the banks to undo them. This happened several times over a few-week period. This wasn't one instance. I see I'm out of time, and I don't want to take away from Mr. Rebell, but I'll finish answering that question. I think it could be pled better. The Circuit Court didn't allow us the opportunity to amend, and it did that deliberately. It thought these issues should be presented to the Court before any other action is taken. So we didn't get the chance to amend the complaint and specify what she had all done. Okay. Thank you. Unless there's any other questions, I'll turn it over to Mr. Rebell. Well, I do have another question. So this is essentially a loss of privacy. Is that right? It is a loss. Yes, it's certainly a loss of privacy, and that's certainly part of the injury because we don't know the extent of it because defendant doesn't clarify what medical information is taken, but some of her medical information was exposed in this data breach. And that means, at least in our allegation, and we intend to prove it, it's in the hands of cyber criminals, and it's likely on the dark web as well. Well, how would a court calculate the value of a loss of privacy? I have two responses to that. Generally, if there's a loss of privacy, courts at least award nominal damages. So at the baseline here, we would have nominal damages for a loss of privacy or privacy invasion. Other than that, it's a lot of expert testimony, and it's really not just the loss of privacy. It's the loss of confidentiality of this personal information and the impact that that has on plaintiff's ability to get insurance. I know we've had a lot of cases where plaintiffs have allegations regarding data breaches causing insurance premiums to increase, her ability to obtain loans, mortgage loans, and credit cards because the banks and other entities at issue can't trust when Rebecca Pettis' name is on the document that it's her. So there's an additional burden in obtaining these things. And it really comes down to a lot of expert testimony on what the value of that burden and the loss of value of this data is. And another question on this loan that was applied for in Columbus, Ohio, wasn't that loan applied for in someone else's name? There's actually multiple loans that were applied for using her information. In one of them, they did not use her name. In the other ones, the bank did not give full details on what was used in those applications. Was that loan approved in that Columbus, Ohio loan? I don't know for sure. I believe it was not based on information Ms. Pettis had provided to the bank. So it did not impact her credit score? We don't allege that. Yeah, we did not allege that, no. Okay. Okay, no further questions. Mr. Abel? Thank you, Your Honor. As we said, we represent plaintiff Jane Doe, whose personal information was compromised. According to the complaint, cyber criminals were able to bypass Christie Clinic's lax security safeguards and access patient data, including patient names, dates of birth, addresses, patient identification numbers, insurance card numbers, driver's license numbers, credit card numbers, and social security numbers. So we know the data was accessed. We don't know the specifics of how much of that data was accessed, but that burden of proof is on Christie Clinic, because standing under Illinois law is an affirmative defense. It's not a threshold burden that the plaintiff has. So Christie Clinic... Was it raised as an affirmative defense? I believe so. We certainly raised both below and here that it is an affirmative defense and that it was burden was met and that there was no standing. Is that correct? Yes, we believe that finding was an error based on the allegations of the complaint. To the extent there's any doubt, the burden of proof is on Christie Clinic. Let me ask you this question. What do you allege that Christie did wrong here? They failed to have industry standard practices. And understand this was dismissed at the complaint stage, so there was no discovery. So we don't know specifically what all steps that they took, but we know that they weren't sufficient to prevent the data breach. And on information and belief, we allege that they didn't use industry standard security. They didn't train their employees in industry standard security practices to avoid phishing attacks. The Illinois Supreme Court has held that Illinois standing law is actually more lenient than the federal or that's in the Greer versus Illinois Housing Development Authority case from 2009. The Illinois Supreme Court has held that Illinois standing law was more demanding than federal. In federal courts, and we cited three post-Maglio decisions by the federal courts that found standing in similar cases, Remus, Ramirez versus Neiman Marcus, Diefenbach versus Barnes Noble Inc., and Lewert versus P.F. Chang's Bistro Inc. Those are all Seventh Circuit cases from 2015, 2018, and 2016. So if the federal courts would find standing, it follows sort of an a fortiori matter that the Illinois courts should find standing in this case. So again, we believe that the circuit court failed to apply Illinois standing law in terms of the burden of proof. It didn't impose a burden of proof on Christie Clinic, and so we believe that for that reason, this court should reverse. Any questions, Justice Welch? No questions. Justice Barberis? No, thank you. Then we'll now hear from the appellee. Thank you. Presiding Justice, and may it please the court, again, John Amarillo for Christie Clinic. I think our conversation today would benefit by just taking a step back for a moment and understanding the larger dynamic underlying plaintiff's case here. Hacks of this sort, as my brother counsel said, are ubiquitous. They're simply a part of modern life, however unwelcome. The legislature understood this, and they reacted by passing the Personal Information Protection Act, PIPA, which lays out the rights and remedies available to individuals who are victims of these kinds of hacks. This represents the legislature's policy determination about how best to handle these situations, and the legislature said, Justice Barberis, to your question, that those in plaintiff's positions have two remedies. One is notice, so they can take steps to protect themselves if they haven't already, and the second is that a Now, the natural implication of that being that a PIPA violation satisfies one element of a consumer fraud act claim, but plaintiffs still have to satisfy all of the other elements of that kind of claim, including actual economic calculable damages if they want to bring suit. There's no debate on those points. Let me stop you for one second with regard to the first element that you brought up that PIPA addresses, which is notice. If I remember correctly from reading the briefs, it took Christy over eight months, is that correct, to notify anyone of the breach? I think it was a little bit over half a year, yes, sir. Okay. Is there any standard or time frame that is put forth through the PIPA Act to give notice? It simply says that it needs to be timely. What constitutes timely would vary based on the size of the breach, coordination with law enforcement, their recommendations, that sort of thing. I think it would have to be evaluated on a case-by-case basis. Okay. In your research, do you know, and maybe you don't, what is the standard time frame from realizing a breach has occurred to giving notice to those that may be affected? I don't know the answer to that, Justice. I'm sorry. All right. I just found it seemed like a pretty long time, eight months or so to give notice to people to start protecting their information. From my understanding, a lot of it has to do with events and considerations that are outside the victim's hands, such as the recommendations of law enforcement, the availability of law enforcement to react because the law does require that we go to law enforcement first when this happens and take our cues from them. Right. Okay. All right. Thank you. But I think we need to ask ourselves why we're here in this case. And we see, you know, common law claims for negligence, breach of contract, fiduciary duty, invasion of privacy, unjust enrichment, you name it. They threw the kitchen sink at this complaint. And the answer is really quite simple. It's because plaintiffs don't like the limited options that the legislature gave them. That's why we're here. Nothing really concentrates the mind like oral argument. And as I was preparing for today, it occurred to me that plaintiff's entire case is just that point in a nutshell. It's also why their claims fail as a matter of law. The city, the Supreme Court said in city of Chicago v. Beretta that litigation should not be used to achieve legislative goals. And by that, the court was saying that plaintiffs can't use the common law to invent new duties and remedies in an attempt to escape legislative policy decisions. Absent, of course, some claim of unconstitutionality, which is just about the only type of claim we don't have here. And yet that's exactly what the plaintiffs here are asking the court to do. Second guess the legislature's policy decisions. The existence of a duty, the creation of a private right of action, these are quintessential policy decisions. Plaintiffs tie themselves in knots trying to convince the court otherwise, but they can't escape that fact. They say, for example, Mr. Laird went into this, that they're not asking the court to recognize a new common law duty, then why are they turning to the Sinkins factors? Of course, they're asking the court to recognize a new common law duty. They spend pages and pages arguing that this duty already exists, along with a private right of action and remedy under the common law. But if that were right, justices, why can't they point to at least one Illinois case recognizing that duty? At least one private right of action and remedy. They don't have it. There's no such case. The only authority on point and council conceded this was Cooney. And it says the exact opposite of what plaintiffs are saying here today. The appellate court said, one, there's no duty. And two, it's not the job of the courts to recognize a new duty when the legislature has specifically addressed the same issue and provided a remedy, even if it's one that the plaintiffs in this case find inadequate. PIPA has been around for nearly two decades. In all of those years, plaintiffs can't find even one Illinois case supporting their argument. And they know that. So they argue that, you know, and we heard it today, that certain fairly discreet minor amendments to PIPA made in 2017 completely changed the landscape by recognizing a new duty to safeguard information. Now, I don't think that's right for a bunch of reasons. One of which is that, you know, basic principle of defines due care. That definition doesn't come into play unless and until the plaintiff establishes a defendant owed them a common law duty in the first place. Plaintiffs get that wrong throughout their brief. They're consistently putting the cart before the horse. But perhaps more importantly, plaintiffs miss that Cooney was decided in 2010. Maglio, which I hope we get into a moment, was decided in 2015. So those decisions, they were already years old by the time the legislature amended PIPA in 2017. As a matter of law, we know that the legislature is presumed to have been aware of those decisions. And yet, they never came up in the legislature's official findings. They never came up in the legislative history. The legislature never said it was taking corrective action in response to those decisions. It never said it was trying to establish a new common law duty. It never said there was a new basis for negligence action, a new remedy, a new private right of action. Nothing of that sort was said. None of the hallmarks of a legislative override are present here. If we look at the Biometric Information Privacy Act, that proves our point in, I think, a dispositive way. It's a very useful comparison. BIPA holds up a mirror to PIPA and shows everything that it is and that it's not. BIPA says it's creating a duty. PIPA does not. BIPA says it's creating a private right of action. PIPA doesn't. BIPA says no actual damages are required to recover. PIPA doesn't. And that really should tell the court everything it needs to know about the strength of Plano's common law arguments here. Mr. Laird also brought up the FTC Act. Allow me to give you one more example of the knots that Plano's tie themselves in to convince the court to second-guess the legislature. If you look at pages 27 and 28 of their opening brief, you'll see their argument for why the Federal Trade Commission Act supports a finding of duty. Now, keep in mind that no court has ever found the FTC Act allows a private right of action. But put that aside for a moment just to follow Plano's argument. They begin by conceding that the FTC Act may not create a duty itself. Then they argue that because the Consumer Fraud Act says it should be construed with some consideration given to FTC interpretations, and because the Consumer Fraud Act has a private right of action, that means the FTC Act creates a duty actionable as negligence at common law. That's two pages of argument distilled into admittedly one run-on sentence. But if it seems like tortured logic, Your Honors, that's not a coincidence. It doesn't make any sense. We don't need to tie ourselves into these kinds of knots to see what's staring at us right in the face. Plaintiffs can't use common law negligence or other claims to escape the legislature's policy decisions. But what kinds of claims and recoveries are allowed when hacks like this occur? Period. I'm happy to get into Mormon. Just one quick point on that, though, because I know a lot of the questions were aimed at damages, so I'd like to go there. Plano's reply hangs their hat against the application of the Mormon doctrine on their assertion that it only applies in contract cases. We all know that's wrong as a matter of law. In Ray's Chicago flood litigation, Chicago v. Beretta, the court explained that economic damages for Mormon purposes are costs incurred in the absence of harm to a plaintiff's person or property. And if that's what's being sought in the shell of a tort claim, it's barred as a matter of law. Those cases had nothing to do with contract relations. Same is true here. Well, same is true here if you ask Petta. Doe disagrees, which is a little awkward given the fact that they filed a joint brief. But putting that aside, the point is Mormon applies to bar all of plaintiff's tort claims. Briefly on standing and actual damages, I'll say just a quick thing about their waiver argument. Obviously, that's wrong. The court knows that, so I don't want to dwell on it. First, in Illinois, you appeal from a judgment, not the lower court's reasoning. We had the judgment here, so a cross-appeal would have been completely inappropriate on our part. Further, the trial court's dismissal of both complaints can and should be affirmed on any basis supported by the record. That includes lack of standing as to both claims, which we argued below. As to standing, to have standing in Illinois, a plaintiff has to prove injury in fact. In this circumstance, that's closely tied to the Consumer Fraud Act's requirement for actual damages, which means that plaintiffs must show economic injuries, and those damages must be calculable. Justice Barberis, Justice Moore, your questions were getting right at the heart of the matter. Neither plaintiff meets that requirement. Again, by linking PIPA to the CFA, the Consumer Fraud Act's requirement for actual damages. Now, I understand that some federal courts have found injury in fact from data breaches, but Article III standing in federal courts is a different question than what the Illinois legislature said is required for individuals in these circumstances to bring a claim in Illinois courts. I don't want to put too fine a point on it or sound glib, but anxiety is not an actual injury or an injury in fact. Plaintiffs put forward some very vague allegations, some of which were discussed during Mr. Laird's argument regarding their fears about what might happen in the future, all of which are contingent on a chain of, to borrow the second district's language, attenuated hypothetical events of criminal actions by third parties, completely independent of Christie. Remember, for perspective here, plaintiffs allege that over half a million people had their personal information stolen in this hack, yet out of all of those people and in all the years since the hack happened, they can't allege a single incident of credit card fraud. They can't allege a single incident in which someone used their social security numbers, their driver's license numbers, or even their name to open a fraudulent account. Justice Moore, you asked about this. The most either of them can muster is a claim that someone in Ohio tried unsuccessfully to use PETA's phone number and address to take out a bank loan. No monetary harm is alleged to have resulted from that. None. The information was a phone number and address that's publicly available. You can find that in Google in 60 seconds. If this were 20 years ago, I'd say you could find it by opening the white pages. There's no difference unless, of course, the argument is that at some undetermined time of the future, a criminal might use their personal information to try to commit identity theft, which is obviously completely speculative. I might note that nowadays there are no white pages to be found. That's exactly, well, that's why I said if this were 20 years ago, it's exactly right. A lot of trees are probably happy about that fact, Justice. It has been 20 years. You know, but we can approach the same problem from a different angle. And Justice Moore, one of your questions got at this point too. It's a very practical way to approach the problem. How could when the only information that was used in the loan application was publicly available information? It's impossible. It's not even a reasonable inference. It's impossible. Neither PETA nor DOE have alleged anything but speculative future harm here. Neither plaintiff has alleged actual economic calculable harm, as the court in Maglio said, in no uncertain terms that they're required to do. They can't even claim that they've lost money paying for credit monitoring because Christie offered to pay for that monitoring up to two years itself. And as even plaintiff's authority makes clear, their non-binding authority, plaintiffs can simply make martyrs of themselves by denying such an offer in an effort to manufacture standing, which is exactly what they're trying to do here. Bare conclusory allegations don't cut it. Speculation about what might happen in the future doesn't cut it. The injury needs to be distinct. It needs to be palpable. The court in Maglio, the court in Cooney, the appellate court in Morris v. Harvey-Cycle, the Supreme Court in Williams v. Manchester, all of which cited in our briefs, all said this. They make the point really clear, and it's this. Increased risk of future harm is an aggravating element of damages. It's not the injury itself. That's what the Supreme Court has said, and it's dispositive here. I welcome the court's questions. Any questions, Justice Welch? No question. Justice Barberis? Not at this time, no. Before I turn it over for rebuttal, I do want to compliment you on your allusion to the good Dr. Samuel Johnson. His actual quote was, when a man knows he's to be hanged in a fortnight, it concentrates his mind wonderfully. Counsel, for being appellate on rebuttal, you may proceed. Mr. Laird, you need to turn your mic on. I apologize for that. No worries. I have three points on rebuttal here. The defense counsel said litigation should not be used to achieve legislative goals. I think the legislative goal is clear here. In 2017, the legislature amended PIPA and added Section 530.45a. That provision specifically says that data collectors like Christie Clinic have to, and it says shall, it's mandatory, shall implement and maintain reasonable data security measures, and it explains why. It's to protect against the unauthorized use, disclosure, acquisition, or modification of personal information. And that is exactly what this case is about. The defendant, in his brief, tries to argue that PIPA is just a notice statute. But if you argue it that way, and if you assume that that's the only remedy available under PIPA, that reads out that requirement. That is what we are trying to impose here, an obligation on Christie to reasonably secure the 500 million-plus, or half a million-plus people whose sensitive information they store on their own servers. The second point that I'd like to make is with respect to standing and waiver. There was a Supreme Court case that came out on Friday. It's Culkins v. Pritzker. I can give you the case number, 2023 IL 129453. And what the court said there is that where you have a determination from the lower court that is adverse to you, even if it's a partial ruling, you have an obligation to cross-appeal. The lower court held that Plaintiff Pettah has standing here. They have an obligation to cross appeal that adverse ruling, and they never did. They've waived that standing argument. But even if you look at the Maglio case, Pettah's injuries are on all fours with what was required in that which is actual use and misuse of the data. It may be difficult to prove, but inferences are read in favor of the plaintiff. And here, directly after this data breach, the same information was used for fraudulent loan applications in a state that plaintiff doesn't even live in. If you want to open the white pages in Ohio, you can do that. Plaintiff doesn't live there. You're not going to find her. So to assume that this information was randomly found on the internet is not a logical conclusion based on the fact that this information was just subject to a data breach. And the last point I'll make is with respect to the economic loss doctrine. And I invite the court to look at the Marriott case. The Marriott case doesn't make a determination on the economic loss doctrine under Illinois law there, but it does a very thorough analysis of the purpose of that doctrine. And the purpose of that plaintiff's from recovering economic losses in tort. The purpose of that doctrine is to prevent plaintiffs from using tort law to circumvent contractual remedies and obligations. And this goes right back to the Mormon doctrine. When you have a plaintiff defect or product defect, you cannot circumvent the UCC and warranty and contractual obligations by trying to use tort law. The law directs you back to contract law. There's no dispute at all whatsoever in this that there is no contract at issue here. There's the duties and issues that the duties that issue do not arise under any contract. They arise exclusively under PIPA and the FTC Act and HIPAA and the common law. If plaintiff has a remedy, it's in the tort law and the economic loss doesn't guide her to any contract because there's none to guide her to. And that's all I have. I don't know, Mr. Bell, if you have anything. You need to turn on your mic, Mr. Abel. I think you've covered it. I guess I would just point out that one of the things that defendant Apele said was that the plaintiff has to prove injury in fact. That's not in fact the case. Under Illinois law as an affirmative defense, the defendant has to prove there was no injury in fact. And because it was their burden of proof, we believe the allegations were sufficient and the court should reverse. Anything else? No, I think that covers it. Any questions, Justice Welch? No questions. Justice Barberis? No, thank you. Okay, this concludes our argument. Court will take this matter under advisement and issue its decision in due course. Thank you, counsel.